WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sun State Towers LLC, | No. CV-17-08075-PCT-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| County of Coconino, | |
| Defendant. | |

Pending before the Court is the Request for Expedited Review Pursuant to 47 U.S.C. § 332(c)(7)(B)(v) of Plaintiff Sun State Towers, LLC ("Sun State") (Doc. 1). For the following reasons, the Court denies the request without prejudice to its renewal on appropriate subsequent facts.

**BACKGROUND**

Plaintiff Sun State is a limited liability corporation registered and doing business in Arizona. Plaintiff's business is to build wireless service facilities and lease those facilities to wireless service providers. In this case, Plaintiff seeks to build a wireless service facility in Coconino County, Arizona and lease the facility to Verizon Wireless ("Verizon"). Verizon identified two gaps in its coverage (a two-mile and a five-mile gap) around the I-40 near Flagstaff which were leading to dropped calls for Verizon customers.

Verizon hired consultants to study the area with the coverage gap and determine possible locations for a new wireless service facility. These consultants identified three

potential locations that could fill the coverage gap. In the first location, about 1,000 feet further from the I-40 than the Toonerville site, the land was in escrow and the private owner was not interested in disturbing that sale by leasing land to Sun State.[1] R000022; R000067; R000132. A second location, and Sun State's preference ("the Toonerville site"), is located on private land adjacent to the first location. In both of these locations, a wireless service facility would need to be built. A third possibility was for Verizon to co-locate with an existing wireless service facility located one mile away from the Toonerville site. This wireless facility is owned and operated by the Navajo Tribal Utility Authority ("NTUA" and "the NTUA site," respectively); it is located on tribal land and governed by tribal law. Co-location allows one wireless service facility to house equipment for multiple wireless service providers. Verizon's consultants rejected the NTUA site because they determined it would not adequately fill the coverage gap, it would take too long to implement, and it was too expensive. Therefore, Verizon and Sun State moved forward on plans to build a wireless service facility at the Toonerville site.

In Coconino County, a Conditional Use Permit ("CUP") is required to build most wireless service facilities. Coconino County Zoning Ordinance § 3.9.B(1).[2] The County's zoning regulations seek to "protect the county's environmental resources and to minimize adverse impacts on visual resources," "minimize the number of towers by encouraging the joint use (co-location) of facilities," and "enhance the ability to provide wireless telecommunication services to county residents, businesses and visitors." *Id*. at § 3.9.A. To achieve these goals, the Ordinance provides an order of preference for ten types of new wireless service facilities, ranging from most preferred to least preferred. Relevant to this case, co-location on an existing tower is ranked as the most preferred; a new tower of 100 to 199 feet in a G zone is ranked as the eighth preferred. *Id.* at § 3.9.C(1)(a). A new

---

[1] This location is no longer in private ownership. It is now controlled by the Navajo Housing Authority. It is unclear whether they would be interested in leasing the land to Sun State.

[2] Coconino County approved a new Ordinance on April 18, 2017. The relevant provisions have not changed.

facility "*shall* use the most preferred facility type and location where technically feasible, even if it results in an increase in the number of facilities or a higher cost." *Id.* at § 3.9.C (1)(b) (emphasis added). The County may only permit a lesser-preferred facility when "the applicant presents substantial evidence to show that it will have a lesser visual impact or is more technically necessary than the use of more preferred facilities." *Id.* The Ordinance also lists disfavored sites, which includes "[a]ny site within a visual corridor or scenic vista, for example in view of the San Francisco Peaks, . . . unless the facility blends with the surrounding natural and human made environment. *Id.* at 3.9.C(2)(b).

To receive a CUP, applicants first apply to the Coconino County Planning and Zoning Commission ("the Commission"). Sun State filed an application with the Commission on January 20, 2016. The Commission held public hearings and eventually granted the CUP on November 30, 2016. R000161. NTUA appealed the Commission's decision on December 14, 2016. R000163–65. An appeal of the Commission's zoning decision goes to the Coconino County Board of Supervisors ("the Board"). The Board hears appeals de novo.

The Board first held a public hearing on February 14, 2017. The first hearing centered primarily on whether the NTUA site and the Toonerville site would equally close the coverage gap. *See* R000013–117. Sun State's studies showed that the NTUA site would provide coverage for the five-mile gap, but not the two-mile gap. R000094. NTUA, however, disputed that their site would not be able to provide sufficient coverage. R000050–57. The Board continued the hearing, giving the parties time to determine standards for measuring the coverage at each location and to discuss the possibility of co-location. R000108–16. The second hearing was held on March 21, 2017. At this hearing, both Sun State and NTUA agreed that the NTUA site could effectively meet Verizon's coverage needs. R000242. Instead, Sun State focused their arguments on other reasons why the NTUA site was not a viable alternative: the short duration of the lease, delays, and the cost. R000242–43. At the end of the hearing, the Board voted 5–0 to approve the appeal and deny the CUP. R000317. The statements of the Board members and the

subsequent written denial identified two key reasons why the Board denied the CUP: the Toonerville site is in a disfavored location and the NTUA site is an alternative which is both not in a disfavored location and would provide the opportunity for co-location. R000407–08.

Sun State seeks this Court's review of the Board's decision pursuant to 47 U.S.C. § 332(c)(7)(B)(v).

## DISCUSSION

### I. The Telecommunications Act of 1996

This case arises under the Telecommunications Act of 1996 (TCA), Pub. L. No. 104-104, 110 Stat. 56. The TCA was enacted with two primary purposes. First, Congress sought to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." *T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 991 (9th Cir. 2009) (quoting TCA, 110 Stat. at 56). At the same time, Congress also sought to "preserve the authority of State and local governments over zoning and land use matters except in the limited circumstances set forth in the [TCA] conference agreement." *Sprint Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571, 576 (9th Cir. 2008) (quoting H.R. Conf. Rep. No. 104-458, § 704, at 207–08).

In striking this balance between preserving local authority and encouraging technological development, the TCA proscribes only certain, limited behaviors by localities. 47 U.S.C. § (c)(7)(B)(i). Localities may not "unreasonably discriminate" amongst providers nor may they "prohibit or have the effect of prohibiting" wireless services. *Id*. Localities also must act quickly on permit requests and denials of permits must be based on "substantial evidence in a written record." *Id.* at § (c)(7)(B)(ii)–(iii). A person or entity believing that the locality violated these provisions of the TCA can seek review of the decision in the federal courts. *Id.* at § (c)(7)(B)(v).

/ / /

## II. Analysis

Sun State raises two challenges under the TCA. First, Sun State alleges that the Board's decision was not supported by substantial evidence. Second, Sun State argues that even if there was substantial evidence, the denial violates the TCA because it constitutes an effective prohibition. The Court considers each argument in turn.

### A. Substantial Evidence

The TCA requires that "[a]ny decision by a State or local government . . . to deny a request to place, construct, or modify personal wireless service facilities shall be in writing." 47 U.S.C. § 332(c)(7)(B0(iii). Although the TCA does not define "substantial evidence," courts have held that "this language is meant to trigger 'the traditional standard used for judicial review of agency decisions.'" *Metro PCS, Inc. v. City and County of San Francisco*, 400 F.3d 715, 723 (9th Cir. 2005) (abrogated on other grounds) (quoting H.R. Conf. Rep. No. 104-458, at 208 (1996)). This is a deferential form of review, and courts can "neither engage in [their] own fact-finding nor supplant the Town Board's reasonable determinations." *Metro PCS*, 400 F.3d at 725 (quoting *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999)).

The substantial evidence determination "does not require incorporation of substantive federal standards." *Metro PCS*, 400 F.3d at 723. Instead, it "requires a determination whether the zoning decision at issue is supported by substantial evidence in the context of applicable *state and local law*." *Id*. at 723–24. The evidence in the record is substantial when there is "less than a preponderance but more than a scintilla of evidence." *Id*. at 725 (internal citations omitted). There must be enough "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Taken together, a Court may not overturn a locality's decision if (1) the local zoning ordinance allows the denial and (2) there is more than a scintilla of evidence.

#### 1. The Local Ordinance Supports a Denial

The Coconino County Zoning Ordinance ("the Ordinance") specifically takes into consideration the preservation of scenic views. It also places a high priority on co-

location. Both of the grounds on which the Board denied the permit are supported by the plain text of the ordinance. The Ordinance seeks to "minimize adverse impacts on visual resources" and does so in part by disfavoring sites "within a visual corridor or scenic vista." Coconino County Zoning Ordinance §§ 3.9.A(1)(c), 3.9.C(2)(b). Localities are allowed to take aesthetic considerations into account when issuing permits. *Sprint PCS Assets, LLC v. City of Palos Verdes Estates*, 583 F.3d 716, 725 (9th Cir. 2009). Nothing in the TCA prohibits localities from considering aesthetics, and nothing in Arizona law does so.

Similarly, the Ordinance "encourag[es] the joint use (co-location) of facilities" in order to minimize the number of towers. Coconino County Zoning Ordinance § 3.9.A(1)(e). This is further reflected by the fact that "[c]o-location on an existing tower" is listed as the most preferred type of new facility. *Id.* at § 3.9.C(1)(a)(1). The Toonerville tower is listed as the eighth most preferred (out of ten), as a new tower of 100 to 199 feet in a G zone. *Id.* at § 3.9.C(1)(a)(8). The Ordinance explicitly states that "[n]ew facilities *shall* use the most preferred facility type and location where technically feasible." *Id.* at § 3.9.C(1)(a). Even without taking into account the Toonerville tower's location in a scenic view corridor, the Ordinance uses mandatory language requiring co-location in place of a new, tall tower. The Board had clear statutory authority to deny Sun State's permit request.

**2. There is Substantial Evidence in the Record to Support a Denial**

The County denied the CUP on two grounds: its location in a scenic view corridor and the presence of an alternative site for co-location. There is substantial evidence in the record for both grounds. The Board did not simply make generalized statements of concern. With regards to the visual impact of the proposed Toonerville tower, the Board had photo simulations to consider. R000123–26; R000130; R000177–81. The County's staff testified that the Toonerville tower was within a scenic view corridor and informed the Board that a permit for the same location had previously been denied due to visual concerns. R000020–26; R000100; R000127. The Ninth Circuit has held that substantial

evidence exists when a city council reviewed propagation maps, reports detailing aesthetic values, public comment, and oral remarks from the parties. *Palos Verdes*, 583 F.3d at 726. Substantial evidence was also found when a handful of residents testified that a wireless service facility would harm their property values and interfere with their views of mountains. *Anacortes*, 572 F.3d at 994–95. It is not this Court's role to review the photo simulations and decide for itself whether the proposed facility negatively impacts the scenic view. The Board had a sufficient amount of evidence before it, between the staff report and the photo simulations, to decide that that tower would negatively impact the scenic view.

The Board also had substantial evidence to determine that co-location on the NTUA site was feasible. By the second meeting, both parties agreed that co-location on the NTUA site was technologically feasible and that it would provide substantially similar coverage for Verizon customers. Plaintiff asserts that the Board failed to evaluate whether the NTUA site was economically feasible. The substantial evidence analysis, however, does not take into account federal standards. At this stage, the only question is whether there is substantial evidence to support a decision made pursuant to state and local law. *Metro PCS,* 400 F.3d at 723–24. The Ordinance explicitly states that cost need *not* be taken into account if there is a more-preferred, technically feasible facility. Coconino County Zoning Ordinance § 3.9.C. The Board heard extensive evidence and presentations from NTUA representatives about the process for co-location, the technological capabilities of the NTUA tower, and NTUA's willingness to negotiate with Verizon. The Board had substantial evidence to determine that the NTUA site was an option for co-location.

**B.     Effective Prohibition**

While the substantial evidence analysis is focused on state and local standards for the zoning of wireless service facilities, the effective prohibition analysis brings in federal standards. Under the TCA, the "regulation of the placement, construction, and modification of personal wireless services facilities by any State or local government . . .

shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). A plaintiff must "establish either an outright prohibition or an effective prohibition[;] . . . a plaintiff's showing that a locality could *potentially* prohibit the provision of telecommunications services is insufficient." *Sprint Telephony*, 543 F.3d at 579. There is no allegation that the Ordinance constitutes an outright ban on wireless service facilities. An effective prohibition claim "involves a two-pronged analysis requiring (1) the showing of a "significant gap" in service coverage[3] and (2) some inquiry into the feasibility of alternative facilities or site locations." *MetroPCS*, 400 F.3d at 731.

In the Ninth Circuit, the provider has the burden of making a "prima facie showing of effective prohibition by submitting a comprehensive application, which includes consideration of alternatives, showing that the proposed [wireless service facility] is the least intrusive means of filling a significant gap." *Anacortes,* 572 F.3d at 998. If that prima facie showing is rejected, the locality "must show that there are some potentially available and technologically feasible alternatives." *Id.* The locality must give the provider the opportunity to dispute the alternatives identified by the locality. *Id.*

### 1. The Toonerville Site is Not the Least Intrusive on the Values the Denial Sought to Serve

For the reasons set forth in further detail below, this Court cannot conclude based on the present record that the Board's determination that the NTUA co-location site is an available alternate location is erroneous. Given that determination, it also concludes that the Toonerville site is not the least intrusive on the values the denial sought to serve. The least intrusive means standard "requires that the *provider* show that the manner in which it proposes to fill the significant gap in services is the *least intrusive on the values that*

---

[3] A significant gap in coverage exists when "the *provider in question* is prevented from filling a significant gap *in its own* service network." *Metro PCS*, 400 F.3d at 732. Therefore, if Verizon cannot fill its own gap, a significant gap in coverage is present. It does not matter whether other wireless providers serve the same area without any gaps. In this case, both parties agree that a significant gap in Verizon's coverage exists. Doc. 24, pg. 2; Doc. 25, pg. 9.

- 8 -

*the denial sought to serve.*" *Anacortes*, 572 F.3d at 995. To determine whether Sun State met their burden, the Court must first "examine the [locality's] stated ground for concluding otherwise." *American Tower Corp. v. City of San Diego*, 763 F.3d 1035, 1056 (9th Cir. 2014). Defendant denied Sun State's CUP because of concerns about the impact on the scenic view corridor and the county's preference for co-location. Therefore, Sun State must show that the Toonerville site is the least intrusive means of meeting the county's goals of minimizing the aesthetic impact on the scenic view corridor and of encouraging co-location.

Sun State has not met this burden. The NTUA site is further removed from the I-40, and therefore is, at least arguably, less visible and has a lower impact on the scenic view corridor. Building a new wireless service facility at the Toonerville site instead of co-locating at the NTUA site does not further the goals of encouraging co-location and minimizing the number of wireless facilities. Plaintiff has not established that the Toonerville site is the least intrusive means of filling the service gap.

### 2. The NTUA Site is an Available and Technologically Feasible Alternative

The parties do not dispute that the NTUA site is technologically feasible.[4] Rather, plaintiff asserts that the County erred by failing to consider the commercial feasibility of the NTUA tower. The Ninth Circuit has never framed the effective prohibition analysis as containing a commercial feasibility component. However, Plaintiff is essentially arguing that the NTUA site is not truly an *available alternative*—the costs and delays associated with the NTUA site are so high that it is *effectively unavailable* and that in denying the

---

[4] At the March 2017 Board hearing, Sun State's engineer admitted that the NTUA site would provide Verizon the coverage needed to fill their service gaps. R000247 ("Now, the NTUA site does a pretty good job of covering. . . . it's not a significant variation."). Sun State's attorney similarly stated that "[w]e think we can get enough coverage, if we had to, on NTUA." R000250. Because both parties now agree that co-location on the NTUA site will fill Verizon's significant service gap, there is no technological reason preventing co-location.

permit and forcing Verizon to contract with the NTUA, they are effectively prohibiting cell coverage.

There are two difficulties in assessing this argument. First, to the extent that Sun State specifies certain asserted regulatory delays attributable to tribal governmental processes or prospective lease terms that Verizon found to be unacceptable in collocating on the NTUA site, the record reflects that NTUA either contested that such delays existed, or represented to the County that it was prepared to negotiate the terms that Verizon indicated were unacceptable.[5] This Court cannot find, based on the materials in the record which establish these assertions by the NTUA, that the Board acted inappropriately.

Second, and relatedly, there is no indication in the present record that Verizon ever actually attempted to discuss with any specificity the actual terms of any lease that it might enter with the NTUA,[6] nor does the record reflect that the NTUA unreasonably

---

[5] *See* R000268 ("[O]ur fees are negotiable. What we gave the appellant was our standard rates. We have in instances accommodated to be competitive with other carriers."); *id* (noting that the duration of the lease and the lease termination provisions are negotiable as well); R000276–277 (noting the negotiability of price); R000279 (noting that prices have been negotiated with other providers in the past). R000284 (stating that negotiability of the lease term and one-year lease termination provision).

[6] *See* R000039 ("NTUA has not received any information for application nor has been officially contacted about timeframes, fees, duration, technical aspects, or any things of that nature, or on the [NTUA] tower or any tower whatsoever in the NTUA portfolio."); R000067–68 (discussing that Verizon did not apply to and has not worked with the Navajo Nation); R000085 ("I got a letter from NTUA indicating that they had not been contacted by the applicant about collocating on the tower while the applicant had said that they had contacted NTUA and it wasn't available."); R000096 (stating that the Sun State attorney "called NTUA in November of 2016 and asked them to please explain their application process" but that "everyone's going to be asking me, why didn't you go to the NTUA site? Well, there's two reasons. Number one, it doesn't fill the gap. And number two, it's going to take far too long to get a site up and operating and all the agreements pulled together and final."); R000156 (noting discussion at the Commission about NTUA's invitation to co-locate and a Sun State representative's promise to speak with Verizon about co-locating with NTUA); R000158 (noting that a Sun State lawyer called NTUA and was told about the leasing process and timeline); R000250 (stating that "we took the NTUA rate matrix . . . and the rent matrix renders a monthly rent of $5400," but failing to discuss where this rent matrix came from or whether there were negotiations to deviate from the matrix); R000256–57 (stating that during the continuance between the two Board hearings, NTUA and Verizon discussed only the coverage differences); R000271 (containing a statement from the NTUA attorney that there were not co-location discussions during the continuance because it was not in Sun State or Verizon's interests at the time); R000280–81 ("[Verizon] would prefer to find

delayed such negotiations so that Verizon could not enter such a lease within a reasonable period.[7] Nor does the record reflect that given the terms of any actual lease Verizon determined it was not feasible to provide coverage.[8] Thus, while the Board may have erred in refusing to consider whether the economic practicalities of an alternative site effectively prohibited Verizon cell coverage, there is in the present record no sufficient factual basis on which this Court can conclude that it does amount to such an effective prohibition. The Board gave Sun State the opportunity to dispute the alternatives that it identified, *Anacortes,* 572 F.3d at 998, Sun State simply did not adequately establish on the present record that the NTUA alternative was an effective prohibition.

### a. Delays

Before the Board, Plaintiff first expressed concern that the application and approval process with NTUA itself would take almost two years. NTUA, however, strenuously disagreed with this claim. NTUA represented to the Board that the

---

something that was more beneficial to our objectives, which was the highway. So that's what we did. It's not that we never looked at the NTUA tower. I conferred with Verizon and [the Toonerville site] was the one that they preferred."); R000281 ("When we asked for the rent sheets, they gave us what they had, and they did not say they were negotiable.").

[7] Additionally, there is some evidence in the record suggesting that Verizon simply did not want to work with the Navajo Nation. *See* R000022 (containing testimony from County staff that "[s]tatements from Verizon to staff indicate that they are unwilling to collocate on a tower on tribal land because in the past when there have been disputes, Verizon was unable to prevail in those disputes"); R000118 (noting the same in a staff report); R000308 ("I've been informed by Sun State Towers and Mr. Chad [Ward, the Principal and Director of Operations of Sun State,] that Verizon would not be willing to work with us on further business."). To the extent that Verizon, actually does assert that commercial relationships with Navajo Nation entities are not commercially reasonable due to the Tribe's inadequate or biased dispute-resolution mechanisms or otherwise, such assertions, to the extent detailed before the Board, might be a relevant factor in determining whether the Board's requirement that Verizon co-locate amounts to an effective prohibition. Still, Sun State did not make a sufficiently detailed record in this respect, for the Court to conclude that the Board erred.

[8] Sun State is at least in some sense NTUA's competitor for purposes of providing an available cell phone tower to Verizon. To the extent that Sun State is also Verizon's agent for purposes of conducting such negotiations with NTUA it is not unreasonable for the Board, in determining whether such negotiations were conducted in good faith, to consider Sun State's possible self-interest. Nor is it unreasonable, in the absence of an actual record of attempted negotiations demonstrating effective prohibition, for the Board to find that the NTUA site is a realistic alternative.

- 11 -

application process with NTUA could be completed in 30 to 60 days. R000093; R000165; R000359. NTUA also provided the Board with a letter from the Navajo Nation Land Development Department stating that the timeframe for approval of leases by the Navajo Nation "can take anywhere from one week to one month." R000377. The Board was not shown any countervailing evidence that would impeach that projected timeline. In absence of any such evidence this Court cannot say the Board erred in finding that such delays were not enough to constitute an effective prohibition.

In addition to concerns about delays on NTUA's end, Plaintiff told the Board that there would be separate delays outside of NTUA's control. First, Verizon would have to restart internal administrative procedures. R000254. Second, Verizon would have to reapply for permits from the Federal Communications Commission. R000255. Plaintiff prepared a timeline for the Board taking these delays into account, and they are more substantial than the delays associated with the NTUA application and lease process. R000405. Delays associated with internal company processes and government regulations are not properly part of the analysis in determining whether a site is an available alternative. If localities were required to take delays like these into account—delays that exist for *all* alternative sites—it would disrupt the balance the TCA sought to achieve. A provider could choose their preferred location and then claim that all existing alternatives were not available due to delay. This would allow the providers' preferred location to trump all other local zoning considerations and leave no recourse for local authorities. However, delays connected with the alternative site *itself*—like the consideration of the NTUA process above—must be taken into account.

The Ninth Circuit expressed similar concerns in *American Tower Corp.* when the provider failed to consider modifications that would bring their applications in line with the zoning ordinances. Although not discussing delays specifically, the Ninth Circuit clearly rejected providers' behavior that "would make the applicant—rather than the locality—the arbiter of feasibility and intrusiveness, gutting the 'least intrusive means' standard with predictable, applicant-friendly results." *American Tower Corp.*, 763 F.3d at

1056. Plaintiff has not established that the delays from moving to the NTUA site render the NTUA tower unavailable.

### b. Cost

Cost can and should be taken into account as a factor in determining whether there is an available alternative. Just as an excessive delay with an alternative site might render it effectively unavailable, so too could a prohibitively high cost render an alternative site unavailable. Refusing to consider cost also allows the owners of the potential alternative sites to act as monopolists, which is expressly counter to the goals of the TCA. *Anacortes*, 572 F.3d at 991. Without considering cost at all, the owners of the alternative sites could ask for exorbitant prices. In this case, NTUA could price their co-location fees as high as they wanted and would have no incentive to negotiate fees with Verizon in good faith. Cost must be considered in determining whether an alternative site is truly available. The Ninth Circuit, in *Anacortes*, listed cost as one of multiple considerations that made potential alternative sites unavailable. *Id*. at 998 (listing environmental impact, additional cost, and location outside of the city's jurisdiction as factors in finding that the city did not identify available alternative sites); *see also Metro PCS,* 400 F.3d at 731 (rejecting the Fourth Circuit's strict effective prohibition standard as not being sufficiently permissive to serve Congress's "twin goals of encouraging competition in the wireless services industry and facilitating efficient use of bandwidth").

But Plaintiff has put forward no evidence that would allow the Board to determine that the lease rate of the NTUA site was unreasonable because the record contains no evidence of any actual negotiation of such rates when the NTUA indicated that its rates were negotiable. The estimated monthly lease price for the Toonerville property will cost $2,250 per month, whereas the NTUA site is projected to cost $5,400 per month.[9]

---

[9] NTUA repeatedly asserted during both Board hearings that all terms of their leases are negotiable, including price. The only cost submitted at hearing was the "list" price of $5,400 per month. Since the NTUA insisted this price was negotiable, and there was no evidence that an attempt had been made to negotiate a lower price, it is not possible for the Court to say the County erred in determining that the co-location site is not cost-prohibitive.

1  R000250; R000404; R000406. The NTUA site may be more expensive. But an alternative site is not made unavailable simply because it is more expensive than the providers' preferred choice. The cost of the alternative site must, in conjunction with other factors, make the site effectively unavailable. Plaintiff can only establish this by putting the relative prices into context. This could include comparisons of the costs of other wireless service facilities in the area or a study of how the alternative site would impact the provider's overall budget.[10] But if Plaintiff could exclude a site as an alternative simply because the cost is not at their desired price, they too would lack the incentive to negotiate honestly with NTUA. It is not the Court or the Board's role to ensure that providers have locations available at their preferred price point. It is the Board's responsibility to ensure that their decisions do not effectively prohibit a provider from filling a gap in coverage.

Although the Board should have considered cost when raised by the applicant during the hearings, the burden remains on the applicant to make a prima facie showing of effective prohibition. Effective prohibition is not met by just stating that one facility may be considerably more expensive than the other. Therefore, the Court will not reverse the Board's decision on these grounds.

### c. Lease Termination Provision

The standard NTUA lease with co-locators lasts for five year. However, the lease contains a provision that allows NTUA to terminate the lease on one-year's notice. R000251. Plaintiff asserts that this essentially converts the lease into only a one-year lease, and that it is not economically feasible for Verizon to invest in the technology for co-location with such a short lease. At the hearings, NTUA noted that all terms in their standard leases were negotiable, including duration. R000268. They also stated that they have never kicked a co-locator off of an NTUA tower.[11] *Id*; R000278. NTUA has a

---

[10] For example, NTUA asserted that their rates are "comparable to other carriers." R000277. The only counterexample Sun State provided in the record and at oral argument was the price of its own tower.

[11] For reference, NTUA currently has 80 co-locations on their towers. R000032.

- 14 -

1  twenty-year lease with the Navajo Nation, and noted that it would be possible to draw out
2  the leases of co-locators to coincide with the length of the lease NTUA has with the
3  Navajo Nation. R000268. While Sun State asserts in its briefing that the NTUA would
4  not abandon its one year lease termination provisions, the Court can find little support in
5  the record that suggests as much. Sun State told the Board once that NTUA did not agree
6  to pull out the lease termination provision, but this conclusory statement combined with a
7  lack of evidence of actual negotiations with or applications to NTUA is not enough when
8  looking at the record as a whole for the Court to conclude that the County erred.
9  R000281. A termination clause is not the same thing as the length of a lease term, and
10 more importantly, Sun State has presented no evidence that such notice provisions are not
11 common in cell phone tower leases. NTUA's express statements of willingness to extend
12 the lease term also weaken any claim for effective prohibition.

### d. Speculative Nature of Site

The NTUA site is not sufficiently speculative to not qualify as an available alternative site. It is true that the lease has not been negotiated and that there is no firm agreement between the parties. However, this would be true of every alternative site; in fact, that is part of what makes it an *alternative* site. But this is not the case of the Board pointing to a random alternative location and just hoping that Verizon will be able to locate the wireless facility there. Rather, NTUA is actually engaging in this process presumably because they desire to work with Verizon and have their site house Verizon's technology. NTUA made repeated representations to the Board that they are invested in contracting with Verizon. The NTUA site is not too speculative.

**Conclusion**

Defendant Coconino County's denial of the CUP complied with the local zoning ordinances and there was substantial evidence to support the Board's decision. Plaintiff Sun State did not establish that the Toonerville site was the least intrusive means of filling a significant gap and comporting with the values sought to be served by the denial of the CUP. Because the Board identified an available and technologically feasible

alternative, the denial of the CUP does not amount to an effective prohibition. The NTUA site provides Verizon with the same coverage as the Toonerville site. The NTUA site does have some drawbacks for Verizon, but the Board provided evidence that the NTUA was willing to negotiate on these points. In contrast Sun State provides no evidence that Verizon actually entered into such negotiations, that such negotiations became too protracted, or that NTUA insisted on terms that, singularly or in combination, effectively prohibited the provision of Verizon cell phone coverage if Verizon were restricted to that site.

**IT IS THEREFORE ORDERED** that the Request for Expedited Review Pursuant to 47 U.S.C. § 332(c)(7)(B)(v) of Plaintiff Sun State Towers, LLC (Doc. 1) is **DENIED** without prejudice to its renewal based on subsequent facts.

**IT IS FURTHER ORDERED** directing the Clerk of Court to terminate this action and enter judgment accordingly.

Dated this 25th day of October, 2017.

_____
Honorable G. Murray Snow
United States District Judge